# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 3, 2016

## STATE OF TENNESSEE v. ALEXANDER JACKSON

**Appeal from the Criminal Court for Shelby County**
**No. 14-04482    James C. Beasley, Jr., Judge**

---

### No. W2015-01741-CCA-R3-CD  -  Filed August 3, 2016

---

The defendant, Alexander Jackson, was convicted by a Shelby County Criminal Court jury of two counts of rape, which the trial court merged and sentenced him to a term of nine years.  On appeal, he argues that his right against self-incrimination was violated by a statement of the prosecutor during closing argument which he asserts amounts to plain error.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Mark A. Renken (on appeal) and Leslie I. Ballin (at trial), Memphis, Tennessee, for the appellant, Alexander Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Katherine B. Ratton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The State's proof at trial showed that the victim went out for drinks with her friend, Melodi Herron, on April 19, 2011.  While they were out, the defendant called to ask if he could wash a load of laundry at her house, something he did weekly.  The victim gave the defendant permission, and she and Ms. Herron went to a few more bars before going home.  The victim was intoxicated, having consumed eight or nine alcoholic

beverages. The victim's friend, Terry Boyland, was also at her house that night, taking care of her son.

When the victim and Ms. Herron got home around 3:00 or 3:30 a.m., the victim took two Benadryl pills to help her sleep and went to bed. Ms. Herron stayed up for about thirty more minutes with the defendant and Mr. Boyland before going to sleep in a spare twin bed in the victim's bedroom. Ms. Herron shut the door to the victim's bedroom before she went to sleep. Mr. Boyland and the defendant stayed up playing video games in the living room for approximately three or four more hours. Mr. Boyland went to sleep around 7:30 or 8:00 a.m., while the defendant was still awake.

The victim awoke the next morning and felt someone on top of her with his penis inside her vagina. The man had a cover over his head, so the victim could not immediately see who it was. The victim looked over at Ms. Herron and screamed, "[W]ho is this[?]" Ms. Herron woke up and was also surprised because they had not brought anyone home with them.

The victim pulled the cover and saw that it was the defendant on top of her. The victim yelled, asking the defendant why "he was just f*cking me and doing whatever he wanted to do." The defendant ran out of the room, saying, "[N]o, you wanted it, you wanted it." The victim replied that she had not wanted to have sex. The defendant claimed that he had come into her room to ask if he could have some noodles and that she had urged him to come to her. The defendant further claimed that he had rejected the victim four times before he relented and had sex with her. The victim did not believe the defendant's account because the defendant knew he was welcome to the food in her house and would not have had to ask. The defendant had also never come into her bedroom to wake her up. The victim reiterated that she did not consent to having sex with the defendant. When the defendant left the victim's bedroom, he told Mr. Boyland, "Bro, she wanted that shit."

The victim called the defendant's cousin, whom she had previously dated, because she knew that was where the defendant would go. The victim then called the police, and the defendant left after she did so. After talking to the police in her home, the victim went to the rape crisis center where she underwent an examination and evidence was collected. The victim reported that she did not know if the defendant had used a condom but originally thought that he might have because the area between her thighs felt greasy. However, she later realized that he did not use a condom based upon the findings of the examination.

2

The victim and the defendant had been friends for four years, and he sometimes stayed overnight at her house when he was washing laundry. The defendant had been around her when she was intoxicated a number of times in the past.

Judy Pinson, a nurse practitioner at the rape crisis center in Memphis, supervised the nurse who examined the victim on April 20, 2011, approximately four hours after the rape. The victim did not have any apparent injuries, which was not unusual in a rape examination of an adult. The examining nurse swabbed the victim's mouth, vagina, anus, and thigh. Ms. Pinson noted that the victim's report of a sexual assault was not inconsistent with the physical findings.

Agent Donna Nelson of the Tennessee Bureau of Investigation tested the swabs from the victim's rape kit. Agent Nelson found semen on the victim's vaginal, anal, and thigh swabs. A partial profile matching the defendant's DNA sample was found on the vaginal swab. Another partial profile matching the defendant's DNA sample was found on the anal swab. The defendant's DNA also matched the sample taken from the victim's thigh. Agent Nelson explained that the partial profile found on the vaginal swab was accurate to a probability of one in 657.9 trillion, which exceeded the current world population, for the African-American population. The profile found on the thigh swab was accurate to a probability of one in 862.1 quintillion for the African-American population. Agent Nelson determined with certainty that the samples taken from the victim's rape kit matched the defendant's DNA.

The jury convicted the defendant, as charged, of two counts of rape.

## ANALYSIS

On appeal, the defendant argues that his right against self-incrimination was violated by a statement of the prosecutor during closing argument. Because he did not raise the issue in his motion for new trial, the defendant asserts that the statement amounted to plain error.

The challenged statement was as follows: "I submit to you that [the victim]'s story makes sense. And there hasn't been any proof that is remotely reasonable to contradict that." Defense counsel objected, and the trial court informed the jury that "it's not the defense's requirement to put on any proof. It's the State's burden to prove their case and so you judge the facts, base it on what has been presented to you." The prosecutor explained that her comment was in regards to the fact that "the witnesses and their credibility haven't really been attacked."

3

In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

For a defendant to be entitled to a new trial on the basis of allegedly improper remarks during the closing argument, the comments must be shown to have prejudiced the case by affecting the jury's verdict. State v. Middlebrooks, 995 S.W.2d 550, 559 (Tenn. 1999). In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. Id. at 560.

"It is never proper for a prosecuting attorney to comment upon a defendant's decision not to testify." State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999) (citing Griffin v. California, 380 U.S. 609 (1995)); see also State v. Thacker, 164 S.W.3d 208, 244 (Tenn. 2005) ("A prosecutor is strictly prohibited from commenting on the defendant's decision not to testify."). However, our courts have held that "[i]t has long been established that a district attorney general may argue that the state's evidence is uncontradicted. This argument does not violate the rule prohibiting comments on the failure of the defendant to testify in support of his defense." Thornton, 10 S.W.3d at 235; see also State v. Rice, 638 S.W.2d 424, 427 (Tenn. Crim. App. 1982) ("Generally, mere argument by the state that its proof is unrefuted or uncontradicted is not an improper comment upon a defendant's failure to testify."); State v. Livingston, 607 S.W.2d 489, 492 (Tenn. Crim. App. 1980) ("[T]he prosecutor merely commented upon the fact that no proof whatsoever was presented by the appellant. This type argument does not constitute a comment on appellant's failure to testify.").

Again, the defendant complains that the prosecutor's statement, "I submit to you that [the victim]'s story makes sense. And there hasn't been any proof that is remotely reasonable to contradict that," violated his right against self-incrimination. However, he acknowledges that "case law does state that it is permissible for the prosecutor to inform the jury that the State's proof was uncontradicted." In this case, the prosecutor's statement was clearly an argument that the State's proof was un-contradicted, which is

4

explicitly permissible under <u>Thornton</u> and its predecessors, and the defendant fails to explain why <u>Thornton</u> should not apply to his case.  Because no clear and unequivocal rule of law was broken or any substantial right of the accused affected, the trial court did not commit plain error by failing to find that the defendant's right against self-incrimination was violated.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE
